Gansey v. Orr.

## GANSEY, Appellant, v. ORR et al.

### Division Two, March 31, 1903.

1. **Parol Contract:** INDEMNITY: STATUTE OF FRAUDS. Where one person invests money at the solicitation of another upon the promise of that other to indemnify him against loss, no action will lie upon such promise unless it be in writing.

2. ——: ——: ——: SUBSCRIBING TO STOCK OF CORPORATION. The plaintiff paid $7,000 for the stock of a corporation which defendants were organizing, and of which they became respectively president and attorney, upon the promise by them that if the company should fail they would themselves pay back to her all the money she paid in. *Held*, that, this promise not being in writing, can not be enforced, even though there is no legal liability on the part of the corporation, in case of its insolvency, to refund the money thus invested in its stock.

3. ——: ——: ——: THE WORD "MISCARRIAGE". The word "miscarriage" used in the Missouri Statute of Frauds was intended to have a broader meaning than "debt" or "default," and should be so construed as to include the failure of a corporation to succeed in a proposed business, the promise being by its promoters to indemnify a subscriber to its stock against loss in case it should fail.

Gansey v. Orr.

Appeal from St. Louis County Circuit Court.—*Hon. R. Hirzel,* Judge.

AFFIRMED.

*Daniel Dillon* for appellant.

Appellant contends that the trial court erred in holding that the promise of defendants was within the statute of frauds, and in granting defendants a new trial for that reason. The fundamental idea underlying this section of the statute of frauds is, that there is another person who is obligated as principal or original obligor, and for the fulfillment of whose promise or obligation the guarantor or second promisor agrees to answer. In this case, in order to have the promise made by defendants to plaintiff come within the statute of frauds, the William A. Orr Shoe Company must have been under an obligation to plaintiff, and for which obligation the defendants by their promise to plaintiff made themselves answerable. "The result of the authorities is that in order to bring the promise within the prohibition of the statute, it must be 'collateral' to the liability on the part of a principal. In other words, there must, at the time the promise is made, be an actual primary liability of a principal to the promisee which continues after the making of the promise, or there must be contemplated, as the basis of such promise, the future primary liability of a principal." 1 Brandt on Suretyship and Guaranty (2 Ed.), sec. 55, page 75; sec. 57, p. 76; Browne on Statute of Frauds (5 Ed.), sec. 157, p. 192; sec. 156, p. 190; Bent v. Hart, 10 Mo. App. 146; Lockhart v. Van Alstyne, 31 Mich. 76; Taft v. Railroad, 8 R. I. 333; Railroad v. Belfast, 77 Me. 452; Warren v. King, 108 U. S. 399.

*Charles W. Bates* and *Finkelnburg, Nagel & Kirby* for respondents.

The alleged contract is within the purpose, intent and language of the statute of frauds, being a contract

of indemnity against loss which might result from the "miscarriage of another." R. S. 1899, sec. 3418; Kirkham v. Marter, 2 Barn. & Ald. 617; Baker v. Morris, 33 Kan. 580; Throop on Verbal Agreements, sec. 122; Sutherland on Stat. Const., secs. 239, 218, 427; Wood on Stat. Frauds, sec. 114; Green v. Cresswell, 10 Ad. & El. 453; Bissig v. Britton, 59 Mo. 399.

BURGESS, J.—This is an action upon an express contract claimed to have been entered into between plaintiff and defendants in the fall of 1890, in respect to which the petition alleges that defendants were at that time organizing a corporation known as the Wm. A. Orr Shoe Company, and that they requested plaintiff to buy shares of the capital stock of said company, and, as an inducement for her to do so, promised and agreed that if said company should fail and not be able to return to its stockholders the moneys they invested in its capital stock, then defendants individually would pay her the amount of money she should pay out in the purchase price of said stock, and that, relying on this promise of defendants, plaintiff promised to buy, and did buy the capital stock of said company to the amount of $7,000, and paid therefor $7,000 in cash; that said company thereafter failed and was placed in the hands of a receiver, and its assets were not sufficient to pay its creditors in full, leaving nothing to return to or distribute among its stockholders; that plaintiff then demanded of defendants that they pay her the $7,000 she had paid for said capital stock of said company, which defendants refused to do.

The answer was a general denial, and also that the promise of defendants was a promise to answer for the debt, default or miscarriage of the Wm. A. Orr Shoe Company, and was not in writing. The reply denied the new matter in the answer.

There was a verdict for plaintiff against both defendants for seven thousand nine hundred and fifty-three dollars.

On motion of defendants the court granted them a new trial upon the grounds that it erred "in refusing to give a peremptory instruction to find for each defendant, as requested at the close of the case; in refusing instructions asked by each defendant at the close of the case; and in giving the instructions asked by plaintiff." . From the order granting defendants a new trial plaintiff appeals.

In the summer of 1890, the Orr & Lindsay Shoe Company of St. Louis announced its intention of retiring from business at the end of that year. A plan was set on foot for the organization of a new concern to purchase its stock in trade and to succeed to its business. In their plans the defendant, William A. Orr, a son of the Orr who was a member of the firm of Orr & Lindsay Company, upon the incorporation of the concern, the William A. Orr Shoe Company, became its president. In the organization of this company the promoters were advised and assisted in all matters requiring the services of a lawyer by the defendant, Isaac H. Orr, a member of the St. Louis bar.

Plaintiff is the wife of John Gansey, a teamster, who for many years during the life of William Orr's father did the hauling for Orr & Lindsay. William Orr had placed on the Gansey farm a driving mare, and on a Sunday in September, 1890, as was his custom, he drove out to the Gansey farm to see the mare, and took with him his co-defendant, Isaac H. Orr. Plaintiff testified as follows:

"I had several conversations with William A. Orr about the formation of the William A. Orr Shoe Company. He first told me he was going to organize a company, and spoke to me a good deal before he organized it. We had our first conversation on this subject about 1890, the year they organized. The conversations were all held at my house on the Hanley road. He had several conversations with me of that nature. William A. Orr told me that it would be a good thing to take stock

in it.  He told me it would be a good investment, that they would buy and sell for cash, and it would be safe. I first saw Isaac H. Orr just before I went into the concern.  He came out to my house one Sunday with William A. Orr.  I had never seen Isaac H. Orr before that. I was away from home when he and William A. Orr came out.  They waited till I came back.  I had gone up to another farm near Creve Coeur Lake to see about it.  I left to go to the farm before dinner, and did not get back until about four o'clock that same afternoon. When I got back home, Mrs. Conroy and William A. Orr and Isaac H. Orr and some others were there.  The Orrs were down in the orchard northeast of the house. I met them after I got home.  The time before this Sunday that William Orr was out to see me I told him I would consider the taking of the stock or going into the concern.'  He brought Isaac Orr out, and Isaac and he talked to me about it.  They told me it would be a good thing.  That Isaac was to be the attorney for it.  I had great confidence in the Orr people.  They said it would be a good thing.  They would buy and sell for cash. I said I don't know anything about your business.  In case they would fail, what would I do?  They said they would pay my money back.  This conversation took place in my house, in the back parlor.  They had come up out of the orchard and gone in the house.  There were others present at the time, but we three were talking together.  The Orrs stayed at my house until after we had some lunch.  In that conversation they asked me to take stock in the new concern they were organizing, and I told them in case it was a failure what would I do, and they told me they would pay me my money back. Mr. Isaac Orr and Mr. Will said that.  Mr. Isaac particularly, because he said he would be attorney, and he would be a stockholder and he would pay me the money back.  I did agree at that time to take the stock.  I told him I would go down and I did.  I gave my check first for four thousand and then for three thousand—seven thousand.  It was about the same time—not so far apart

—not so very long, I don't think. I gave a check to A.
C. Stewart and he paid it to Mr. Orr and then Mr. Scott,
I gave him a check, and he gave it to Mr. Orr. I never
got any certificates for my stock. They never issued
them until after the concern was broke up. That is
what I heard. I never got any money back. They de-
clared one dividend; it was four hundred and eighty
dollars. There was only one dividend declared. That
was the first year. I was away from home at the time,
and when I got back I had a letter from them. I had
several conversations with Mr. Will Orr, who was pres-
ident of the company, about the company after I had
gone into it. At first he said they were getting along
fine; then he said it was pretty hard times; different
things about it. I never had any other conversation
with Mr. Isaac Orr after that Sunday. I never saw
him, except to see him go in and out. Before I had the
conversation with William and Isaac Orr, William
would come out to my place on Sunday afternoons and
talk the matter over with me. The conversation I had
with Mr. Isaac Orr and William occurred towards the
fall of the year. It was warm weather. It was pretty
late in the afternoon when they left my house that Sun-
day.''

She was corroborated to some extent by one Mrs.
Conroy who testified she was present and heard the
conversation.

Defendants testified that nothing was said at the
time of their visit to the Gansey farm to Mrs. Gansey
about the William A. Orr Shoe Company, and that
neither of them made any such promise, or had any such
conversation as Mrs. Gansey claims about stock in the
company, and that Mrs. Conroy was not present at that
time.

In the latter part of December, 1890, Mrs. Gansey
purchased from defendant William A. Orr seventy
shares of stock in the new company standing in the name
of William A. Orr, but of which he was trustee for the
company.

She received one dividend, in 1891. After that dividends ceased, but the business continued until 1896, and Mrs. Gansey visited the store during all those years, meeting William A. Orr frequently, knowing that the stock was depreciating in value, but never until a few days before the bringing of this suit did she intimate to either defendants that she claimed to have a contract with them to indemnify her.

There was irreconcilable conflict between the evidence of Mrs. Gansey and Mrs. Conroy on the one part, and of the Orrs, Chas. S. Broadhead, Esq., and other witnesses for the defense, on the other part.

Upon the first trial, in the circuit court, city of St. Louis, plaintiff testified: "Q. When did Isaac Orr promise? A. He did, both together, at my house. Q. That was the time you said you would see about it? You said, when they made that promise, you would see about it? A. Yes. Q. When you went down to the place of business you only saw Will? A. I don't remember seeing Isaac; I am not sure.

"By the Court: I understand, when they made the promise out there, you said you would see about it; you didn't accept, but you would see about it? A. That was Mr. Will Orr. Q. They were both at your house? I understand you to state, on direct examination, that one of them stated in the presence of the other, if anything went wrong in the business, or if the business failed they would pay you back the money; you said, 'Well, I will see about it?' Then you went down to the store and saw Will Orr, yet didn't see Isaac Orr? A. I don't remember. Q. And, subsequently, the same statement was made by Mr. Will Orr, that if the business was not successful or if anything happened, then he would pay back your money. Thereupon you subscribed for the stock? It that correct? A. Yes, but on condition of what Isaac Orr told me, both, before I paid the money; one was attorney and one was president; certainly I took their word, I thought they

were gentlemen and honest. Q. When did Isaac Orr promise? A. He did, both together, at my house. Q. That was the time you said you would see about it? You said, when they made that promise, you would see about it? A. Yes."

Defendant William A. Orr, asked the court to instruct the jury as follows, which the court refused:

"1. The court instructs the jury that under the pleadings, and all the evidence your finding must be for the defendant, William A. Orr.

"2. The court instructs the jury that even though you may believe from the evidence that defendant, William A. Orr, orally promised plaintiff that if the William A. Orr Shoe Company should fail, or if anything should happen in its business, he would pay her all the money paid by her for stock in said company, nevertheless your verdict should be for defendant, William A. Orr."

Defendant, Isaac H. Orr, asked the court to give the two following instructions, which the court refused:

"1. The court instructs the jury that under the pleadings and evidence their verdict should be for defendant, Isaac H. Orr.

"2. The court instructs the jury that even though you may believe from the evidence that defendant, Isaac H. Orr, orally promised plaintiff that if the William A. Orr Shoe Company should fail, or if anything should happen in its business, he would pay her all the money paid by her for stock in said company, nevertheless your verdict should be for defendant, Isaac H. Orr."

At request of plaintiff the court gave the two following instructions over the objection and exceptions of defendants:

"1. If the jury believe from the evidence that at or about September, 1890, defendants solicited or asked plaintiff to buy capital stock of the William A. Orr Shoe Company, a corporation, and as an inducement to plaintiff to buy said stock, promised and agreed with plain-

tiff that if she would buy said stock she would not lose any of the money she should pay for said stock, and that if said company should fail or become insolvent or unable to return or pay back to its stockholders what they paid for their stock, then defendants would pay to plaintiff the amount of money she should pay for the capital stock of said company; and if the jury further believe from the evidence that plaintiff, influenced by said promise and agreement and by reason and in consequence thereof, then and there agreed to buy and thereafter did buy seventy shares of the capital stock of said company of the par value of $100 each and did pay $7,000 therefor; and if the jury further believe from the evidence that said shoe company thereafter and before the commencement of this suit did fail and become insolvent and unable to return or pay back to its stockholders what they paid for their stock, then the jury will find in favor of plaintiff.

"2.    If the jury find in favor of plaintiff they will assess her damages in the sum of $7,000 and interest on the same at the rate of six per cent per annum from the commencement of this suit, viz., December 21, 1897."

At request of defendants the court gave the seven following instructions:

"1.    Unless the jury are reasonably satisfied by a preponderance of the evidence, which means the greater weight of the evidence, that the defendants on or about the —— day of September, 1890, were at the dwelling house of the plaintiff and then and there solicited and asked the plaintiff to buy some capital stock of the Wm. A. Orr Shoe Company and then and there, to induce plaintiff to buy such stock, the defendants both promised and agreed with plaintiff to repay her any amount she would invest in capital stock of said company and keep her harmless from all losses by reason of such investment should the said Wm. A. Orr Shoe Company fail in its business and become insolvent; and unless you further believe and find from the evidence that de-

fendants by such alleged representations did then and there induce the plaintiff to buy such stock, the plaintiff can not recover and your verdict should be for the defendant.

"2.   The court instructs the jury that even though you may believe from the evidence that prior to the investment by plaintiff in stock in the Wm. A. Orr Shoe Company, the defendant, Wm. A. Orr, represented to plaintiff that a purchase of stock in said company would be a safe investment, and even though you may believe that plaintiff relied upon such representations in buying stock in said company, nevertheless he is not liable to plaintiff unless he further promised that if she bought stock he would see that she did not lose, and if the company failed to pay back her investment he would individually pay it to her; so that if you believe from the evidence that William A. Orr did not make any promises or agreements of that nature, then your verdict must be for the defendant, William A. Orr.

"3.   The court instructs the jury that if you believe from the evidence, that William A. Orr did not, on the Sunday in 1890 when he visited plaintiff with Isaac Orr, make to plaintiff the promises or agreements alleged in her petition, then your verdict must be for the defendant, William A. Orr.

"4.   On behalf of defendant Isaac H. Orr the court instructs the jury that the burden of proof is upon plaintiff to establish by a preponderance of the evidence all the facts necessary to a recovery as explained in other instructions; and by the terms 'preponderance of the evidence' is meant that the probative force of the evidence in favor of plaintiff must in your estimation exceed that in favor of defendant, Isaac H. Orr. So that if you find that the evidence in favor of said defendant Isaac H. Orr is as great or greater in weight than in favor of plaintiff, your verdict should be for defendant Isaac H. Orr.

"5.   The court instructs the jury that the burden of proof is upon the plaintiff to establish by a preponderance of the evidence all the facts necessary to a recovery, as explained in other instructions; and by the term 'preponderance of evidence' is meant that the probative force of the evidence in favor of plaintiff must in your estimation exceed that in favor of the defendant, William A. Orr; so that if you find that the evidence in favor of the defendant, William A. Orr, is as great or greater in weight than in favor of plaintiff, then your finding should be for the defendant, William A. Orr.

"6.   The court instructs the jury that if you believe from the evidence that defendant William A. Orr, and Isaac H. Orr, did not promise the plaintiff that if the company should fail they would pay to her the amount paid by plaintiff for stock in said company, then your verdict should be for the defendants, William A. Orr and Isaac H. Orr, even though you may also find from the evidence that said defendants represented it to be a good and safe investment.

"7.   If you believe and find from the evidence that the defendants were together at the house of the plaintiff only once during the fall of 1890, and while they were so together with the plaintiff neither of them conversed with plaintiff about the purchase of stock in the Wm. A. Orr Shoe Company, then your verdict must be for both of the defendants."

Of its own motion the court gave the following instructions:

"3.   You are the sole judges of the weight of the evidence and the credibility of the witnesses, and in determining the same you should consider the manner of each witness on the stand, his or her interest in the result of the case and the probability or improbability of his or her statements viewed in the light of all the other testimony in the case; and if you believe that any witness has willfully sworn falsely to any material fact

in the case, then you may disregard any part or all of such witness's testimony.''

Plaintiff contends that the trial court erred in holding that the promise of defendants was within the statute of frauds and in granting defendant a new trial for that reason. Upon the other hand, defendants insist that the alleged contract is within the purpose, intent and language of the statute of frauds, being a contract of indemnity against loss which might result from the ''miscarriage of another.''

By section 3418, Revised Statutes 1899, it is provided that ''no action shall be brought to . . . charge any person upon any special promise to answer for the debt, default or miscarriage of another person . . . unless the agreement upon which the action shall be brought, or some memorandum or note thereof, shall be in writing and signed by the party to be charged therewith, or some other person by him thereto lawfully authorized.''

There is great conflict in the authorities as to whether a parol promise to indemnify one who becomes surety for another at the request of the promisor is within the provisions of a statute of frauds like ours, some holding that unless some liability or duty of a third person already exists, or is to be created, there can not be an agreement to answer for that debt, default or miscarriage of another. [Browne on Statute of Frauds (5 Ed.), section 157; 1 Brandt on Suretyship and Guaranty (2 Ed.), secs. 55-57.] But other authorities hold, and such seems to be the rule in this State, that where one person invests money at the solicitation of another and upon the promise of the latter to indemnify him against the consequences, no action will lie upon such promise unless it be in writing, under the statute of frauds, supra, and this, too, even though there be no legal liability on the part of the corporation in whose capital stock the money is invested to refund the same upon its insolvency.

Green v. Cresswell, 10 Ad. & El. 453, is regarded as the leading case upon this question, and it was there held that if a person become bail for a stranger, in consideration of the request of another, and of such person promising him to indemnify him against the consequences, no action will lie upon such promise unless it be in writing, because the promise is in the fourth section of the Statute of Frauds, statute 29, c. 2, c. 3.

Section 3418, Revised Statutes 1899, supra, is substantially the same as the English statute quoted, and there is no difference in principle in that case, and the one at bar. And while that case is not in line with Thomas v. Cook, 8 B. & C. 728, which is followed in a majority of the States, it is followed in Alabama (Brown v. Adair, 1 Stew. 51; Godden v. Pierson, 42 Ala. 370); Illinois (Brand v. Whelan, 18 Ill. App. 186); in Ohio (Easter v. White, 12 Ohio St. 219; Kelsey v. Hibbs, 13 Ohio St. 340; Ferrell v. Maxwell, 28 Ohio St. 383); in Mississippi (May v. Williams, 61 Miss. 125); in Missouri (Bissig v. Britton, 59 Mo. 204); in North Carolina (Draughan v. Bunting, 9 Ired. 10); in South Carolina (Simpson v. Nance, 1 Spears 4); in Tennessee (Macy v. Childress, 2 Tenn. Ch. 438); and in Pennsylvania (Nugent v. Wolfe, 111 Pa. St. 471).

In Baker v. Morris, 33 Kans. 580, it is held where a minor son had negligently and carelessly killed a mare belonging to another for which the father was not liable, that a promise by the father not in writing to pay the value of the mare did not render him liable because within the statute of frauds.

In passing upon the meaning of the words "debt," "default," and "miscarriage" in Wood on Frauds, section 114, it is said, that they "apply (1) to guaranties for an existing debt, (2) guaranties for future debts, or for *future losses,* which may be incurred by the acts of a third party, (3) to some past or future default in duty by a third party."

It is not contended by defendants that a stockholder as such is a creditor of the corporation: there was therefore no "debt;" nor is it contended that the corporation owed or would owe to plaintiff, as a stockholder, any duty except the duty to use reasonable judgment, care and diligence in the conduct of the business, and to refund her share of any surplus remaining upon liquidation after the payment of debts.

For want of care, etc., in the conduct of the business, the corporation would not be liable, nor was there any surplus upon liquidation; hence, there was no "default" for which Mrs. Gansey could have held the corporation in a civil action.

The word "miscarriage" was clearly intended to have a broader meaning than either "debt" or "default," and should be so construed as to include the failure by a third party, in this case the William A. Orr Shoe Company, to succeed in the proposed business, regardless of the fact whether its failure to do so would entitle the plaintiff to an action at law against the company or not.

The requirement that an actionable duty shall exist was made first by the court in cases of "debt"—because, unless there was a "debt" owing by the third party, that part of the statute clearly did not apply. The same requirement was later extended to "default," meaning "default in any duty," and for the same reason. But the reason does not exist in the case of "miscarriage," i. e., the act of a third party, whether actionable or not, and the requirement should not be made.

In other words, if any meaning or force at all is to be given to the word "miscarriage," it must mean something different from or broader than "debt" or "default"—and this is the only distinction that can be made.

For a time it was contended that the statute did not apply to a promise to indemnify against "future losses which might be incurred by the acts of a third party."

Vol 173 mo—35

The courts are still divided upon this point, some following Thomas v. Cook, supra, holding that a promise to indemnify a surety is not within the statute; others following Green v. Cresswell, supra, to the contrary. The latter rule was adopted by the courts of this State and has been consistently adhered to.

Thus in Bissig v. Britton, 59 Mo. 1. c. 213, it is said: "In whatever aspect the case is presented, we can construe it in no other light than that the obligation of suretyship entered into by the plaintiff was to be a responsibility for the default of other persons, to-wit, Wisner and others; and that, therefore, the promise of indemnity made by the defendant was within the Statute of Frauds, and being verbal, must be held incapable of enforcement."

In Hurt v. Ford, 142 Mo. 283, that case was followed, in which it was held that an oral promise to take up a certain note when it became due and save the defendants harmless was within the Statute of Frauds.

The promise by defendants to plaintiff was simply an agreement to indemnify her against the miscarriage of the business enterprise thereafter to be entered into by the William A. Orr Shoe Company, and was clearly within the letter, spirit and purpose, of the statute.

The case of Morehouse v. Crangle, 36 Ohio St. 130, relied upon by plaintiff, is not in harmony with the views herein expressed, but we must decline to follow it because of this fact, and especially because not in line with the trend of the decisions of this court.

Notwithstanding the promise sued upon is alleged to have been made by the defendants to plaintiff, and she was thereby induced to invest $7,000 in the shoe company, after it had been incorporated, in our opinion it is clearly a collateral undertaking to answer for the miscarriage of another, and clearly within the Statute of Frauds.

Our conclusion is that the court did not err in setting aside the verdict of the jury and granting a new trial upon the ground herein indicated.

The judgment is affirmed. All of this Division concur.