DELIA E. JOHNSTON, Appellant, v. GEORGE B. JICKLING
ET AL., Appellees.

DELIA E. JOHNSTON, Appellant, v. HENRY HORRAS ET AL.,
Appellees.

**Trusts:** STATUTES: EVIDENCE. Both the statute of frauds and Code
1 section 2918, requiring that declarations of trust must be exe-
cuted as deeds of conveyance, relate to the character of evi-
dence and do not declare a parol trust in lands invalid; so
that where the trustee admits the trust, or where a parol trust
has been fully executed, they have no application.

**Dower:** ACTION TO ESTABLISH SAME: BENEFICIAL INTEREST OF HUS-
2 BAND: EVIDENCE. In an action by the widow to establish her dow-
er interest in lands conveyed by her husband alone, it is com-
petent to show by parol that the husband had no beneficial inter-
est in the property, and that he simply reconveyed the same
to his grantor or some one designated by him; and the act of
the husband in reconveying under such circumstances is not
a fraud upon the wife which she can urge in support of her
claim of a dower interest in the property. Evidence held to
show that the husband never had any real interest in the land
and that the same was not subject to the wife's dower.

*Appeal from Madison District Court.—*HON. EDMUND
NICHOLS, Judge.

SATURDAY, FEBRUARY 20, 1909.

SUIT in equity to establish, set aside and quiet in
plaintiff her title to one-third of certain lands described
in the petitions. Plaintiff bases her claim upon the fact
that she is the widow of J. H. Johnston, deceased, who
died December 27, 1904, that Johnston at one time owned
the lands in controversy, and that she, plaintiff, never re-
linquished her dower interest therein. Various issues were

tendered by defendants to some of which we shall refer during the course of the opinion; and upon trial to the court a decree was entered dismissing plaintiff's petition in each case.    Plaintiff appeals.—*Affirmed.*

*McLaughlin & Shankland* and *Thos. A. Cheshire,* for appellant.

*John A. Guiher, Wilkinson, Smith & Wilkinson, Robbins & Wilkie, Robert B. Meloy* and *H. L. Wallace,* for appellees.

DEEMER, J.—J. H. Johnston, now deceased and some time plaintiff's husband, held the legal title to the land in controversy.    He individually conveyed these lands to the defendants herein or their grantors; his wife not joining in the conveyances either to release her dower or otherwise.    J. H. Johnston died December 27, 1904, leaving plaintiff and a daughter Winnie surviving.    Plaintiff claims that, as his widow, she is entitled to one-third of the lands of which he was possessed, and to which she had made no relinquishment of her dower.    If the facts above recited were all there is of the case, it is manifest that plaintiff would be entitled to a decree substantially as prayed; but defendants say that J. H. Johnston never had any beneficial interest in these lands, that he held the title in trust for one Simpson and in performance of that trust conveyed the title thereto as directed, and that his wife never had any interest in or to said lands.    It is further claimed, and the testimony shows, that Johnston obtained a divorce from the plaintiff under the name of Dell Johnston in the district court of Washington County, Neb., on the 19th day of September, 1889, upon service by publication.    This divorce was obtained before he, J. H. Johnston, obtained title to the lands in controversy.    While the divorce suit was pending J. H. Johnston conveyed certain

property in Monroe, Iowa, to plaintiff, and she has since conveyed that to others by warranty deed; John H. Johnston not joining therein. In November of the year 1894 J. H. Johnston married one Mrs. Culbertson, and this marriage was made public. Johnston obtained a divorce from this second wife, and thereafter married Mamie Larkins, and the fact of this third marriage was made known to various parties in Jasper County, Iowa. Plaintiff has always lived in Jasper County. By her first husband she had one child, Winnie, who was married at Prairie City, Iowa, plaintiff's home, in the year 1891, to one Rule. It is also claimed that there was a sale of the lands in controversy at sheriff's sale, which finally ripened into a deed, and that this barred plaintiff of any interest in the property.

It will be observed that on the face of what may be called the record title plaintiff is entitled to the relief demanded because she was the wife of Johnston, and has never signed away her inchoate right of dower. On the other hand, a decree of divorce appears in the record which in itself deprived plaintiff of all right in and to the property, and the burden is upon her to get rid of this decree in order to establish any right or title to the lands or any part thereof. The burden is upon the defendants to show that Johnston held the lands in trust, and on plaintiff to show that the divorce referred to is invalid. By reason of the subsequent marriages of Johnston there is also a presumption of divorce which counts in defendant's favor. For reasons which will presently appear, the judicial or execution sale cuts no figure in the case. With reference to the divorce granted in Nebraska, it is contended that the court which passed the decree had no jurisdiction, for the reason that neither party was a resident of that State, that the decree was and is invalid, and that Johnston, while a resident of Iowa, became and was adjudged insane, and could not thereafter change his resi-

dence or domicile nor enter into a valid trust agreement such as is claimed with reference to the lands in controversy. Many defects are also pointed out in the divorce proceedings which are claimed to be fatal to the decree.

With the issues in mind and the burden of proof as to the various matters stated, we now go to the evidence, and from this gather the following facts: Plaintiff was married to John H. Johnston at Knoxville, Iowa, on December 31, 1868, and soon thereafter they took up their residence at Red Rock, in this State. Thereafter they lived for a time at Walnut, Iowa, and still later moved to Jasper County, Iowa, where the husband engaged in the live stock business. It is claimed by plaintiff that he continued to live in Jasper County until his death, December 27, 1904, although it is admitted that he was in many western States, and made trips both to England and to South Africa while engaged in the live stock business. It is also admitted that about the year 1880 he made his headquarters at Blair, Neb., and that in the year 1886 he became temporarily insane, was brought to Jasper County, and there adjudged insane and committed to the hospital at Mt. Pleasant, where he remained for about six months, when he escaped and returned to Blair, Neb., which place he made headquarters until about September, 1889. When he went to Blair, he soon began living with a woman named Fannie Whitted at hotels and in rented apartments. On July 31, 1889, Johnston brought suit for divorce in the district court of Washington County, Neb., against "Dell Johnston," who it is claimed was well known to be plaintiff, in which he alleged that defendant had been guilty of desertion for the period of more than three years. Notice directed to "Dell Johnston" was printed in a newspaper published in Washington County, Neb., for the requisite time, and no one appearing, default was entered, and on September 19, 1889, a decree was passed granting plaintiff therein a decree of divorce. From the time of his

marriage down to the date of his . divorce, Johnston frequently visited plaintiff and his children, and contributed to their support. From about the year 1882 and down to September 19, 1889, he wrote many affectionate letters to plaintiff as his wife, and upon the very day upon which the divorce was granted he wrote a letter in which he addressed her as such. After the decree was granted, he wrote letters to plaintiff, but addressed her as Dell or as Mrs. Dell Johnston.

On March 3, 1894, one Thomas Simpson conveyed the premises in controversy by warranty deed to John H. Johnston; he, Simpson, at that time being the owner of the land. At that time Simpson was a married man, but his wife did not join with him in the deed. On May 24 of the same year Johnston conveyed the land by warranty deed to Lee & Benedict; the deed indicating on its face that at that time he, Johnston, was a single man. On June 14, 1894, Helen Simpson, wife of Thomas Simpson, executed a quitclaim for the lands in controversy to Lee & Benedict. On the day that Johnston received the conveyance of the land, he executed a mortgage thereon for the sum of $2,000 to J. M. Simpson, and on the 23d day of May, 1894, he executed a second mortgage for the sum of $600 to James M. Simpson. On the 28th day of March, 1894, he executed a mortgage in the sum of $400 to Samuel W. Simpson. Thomas Simpson had married one Nellie Dennison on September 21, 1891, and she was thereafter known as Helen Simpson. On July 11, 1892, she brought action against her husband in the district court of Madison County for separate maintenance, and asked for temporary alimony. The latter she was awarded, and, upon appeal, this award was confirmed; the opinion having been filed May 19, 1894. See 91 Iowa, 235. By antenuptial contract between Thomas and Helen Simpson, it was provided that the wife was to have no interest in her husband's property after his death. On November 12, 1894, Fannie

Whitted, or Fannie Whitted Culbertson, with whom J.
H. Johnston had been living since about the year 1881,
secured a license from the county clerk of Cook County,
Ill., to marry Johnston and on the 13th of that month
they entered into a ceremonial marriage in the city of
Chicago. In the year 1878 one Barton and husband con-
veyed to plaintiff, under the name "Dell E. Johnston,"
certain property in Monroe, Iowa, in which she resided
for many years, and in August of the year 1889 Johnston
executed a deed to Dell E. Johnston conveying all his in-
terest in the Monroe property, and again, on February
6, John H. Johnston executed to one Hummel a quitclaim
deed for the Monroe property. It is claimed that Thomas
Simpson made the deeds of the land in controversy to
John H. Johnston because he had confidence in him, John-
ston, and believed he, Johnston, could settle the difficulties
which he, Simpson, was then having with his wife better
than any one else; that the land was deeded to Johnston
for the purpose of effectuating such a settlement; and that
when the settlement was made the land was to be deeded
back to Simpson, or to some one designated by him. Tes-
timony was adduced to the effect that no consideration was
paid for the conveyance, that Johnston took simply the
naked legal title for the purposes named, and that he was
to have compensation for the services rendered by him.
Lee & Benedict, to whom Johnston made the conveyance,
were his (Johnston's) employers, and, as will presently
be seen, they followed out his directions in placing the title.
Johnston succeeded in settling with Helen Simpson, agree-
ing to give her $2,500, and Lee & Benedict made a mort-
gage upon the land to Mrs. Simpson for that amount;
there being some agreements as to priorities with the pre-
vious mortgagees. On May 26, 1894, two creditors brought
actions against John H. Johnston, and levied upon the
land in controversy. On January 29, 1895, Lee & Bene-
dict conveyed the property to Samuel W. Simpson, subject

to mortgages amounting to $3,000, which the grantee agreed to pay, and at the same time he, Simpson, executed a mortgage to one Murray for the sum of $3,000 in order to settle his matters with Helen Simpson. This $3,000 was made a first mortgage upon the land, and a second one was issued to J. H. Johnston for $2,000; and a third for $1,800 was made to James W. Simpson. The $3,000 mortgage was foreclosed, Johnston being made a party, and the land sold and a sheriff's deed subsequently executed. Defendants trace their title through this foreclosure, sale, and deed. J. H. Johnston obtained a divorce from his second wife, Fannie Whitted Culbertson, and thereafter, as has already been stated, he married one Mamie A. Larkins, who resided in Jasper County, Iowa, and whom he thereafter introduced as his wife. His last marriage occurred some time in the year 1902 or 1903. The ultimate facts above recited are practically conceded, although different inferences are sought to be deduced therefrom by the respective parties. It is conceded that there is no dower in a trust estate, and such is the undoubted rule. *Langworthy v. Heeb,* 46 Iowa, 64; *McDaniel v. Large,* 55 Iowa, 312.

But it is argued that the trust, if there was one, in J. H. Johnston for his grantor Simpson, was an express one, resting in parol, and that it can not be proved in this proceeding for the reason that the statute 1. TRUSTS: statutes: evidence. (Code, section 2918) provides that such trusts must be in writing, and can not be established by parol testimony. Further, it is argued that the conveyance from Simpson to Johnston was made with intent to defraud his (Simpson's) wife, and was fraudulent and void, although legal and valid as to every one save Mrs. Simpson. It is true, of course, that, generally speaking, an express trust can not rest in parol, and that a fraudulent conveyance is good as between the parties thereto; but it is just as well settled that neither the stat-

ute referred to nor the statute of frauds declares a parol trust invalid. These statutes have reference to the character of the evidence which must be adduced as against the holder of the legal title. If the trustee admits the trust or if the parol trust has been fully carried out and executed, the statute does not apply. *Westheimer v. Peacock,* 2 Iowa, 528; *Merchant v. O'Rourke,* 111 Iowa, 351; *Karr v. Washburn,* 56 Wis. 303 (14 N. W. 189); *Eaton v. Eaton,* 35 N. J. Law, 290; *Hays v. Reger,* 102 Ind. 524 (1 N. E. 386); *Bork v. Martin,* 132 N. Y. 280 (30 N. E. 584, 28 Am. St. Rep. 570); *McCormick v. Griffin,* 116 Iowa, 397; *Atkinson v. Hancock,* 67 Iowa, 452; *King v. Bushnell,* 121 Ill. 656 (13 N. E. 245); *Cresswell v. Mc-Caigg,* 11 Neb. 222 (9 N. W. 52).

Again, it is argued that, conceding these rules, the testimony shows that Simpson made the conveyance to Johnston to defraud his (Simpson's) wife, and that no court should allow parties who claim under

*2. DOWER: action to establish same: beneficial interest of husband: evidence.*

a conveyance made by a fraudulent grantee to establish that fact. If Simpson's wife were the party complaining of the conveyance, this would doubtless be true. But the action before us is brought by the wife of the so-called fraudulent grantee who has reconveyed the land to his grantor, or to another by his direction; and defendants are not bound to prove the fraud in order to establish their defense. All that they need show is that Johnston never had any beneficial interest in the property. They do not have to rely upon the alleged fraud in order to defeat plaintiff's action. It was perfectly competent for them to show by parol that Johnston never had any beneficial interest in the property, and that he reconveyed the property to his grantor or to some one designated by him. Johnston's wife was not in privity to him in the matter of this conveyance; and, while as between the parties a fraudulent conveyance is good and can not be set aside except at the

suit of creditors, the parties themselves may by reconveyance purge the transaction of the fraud, and, unless one be in privity to the conveyance, he can not complain. Johnston recognized that he never held any beneficial interest in the property, and in making the reconveyance he did not defraud his wife. See cases cited in 10 Am. & Eng. Ency. of Law, 142. In answer to this it is contended that Johnston was adjudged insane in March of the year 1886, and was committed to the hospital for the insane; that his insanity once shown is presumed to have continued; and that, while he might as an insane person take title to land, he could not convey it to another. Of course, if the title passed to Johnston while insane, and he never recovered sanity, it may be that his conveyances thereafter might be treated as voidable. But to appellant's contentions there are several answers. In the first place, it is shown that Johnston's insanity was temporary, and that after his escape from the asylum he recovered his faculties, and continued to do business down to the time of his death. Again, it is not shown that his grantees had any notice or knowledge of his insanity, or that any one in privity to the conveyances made by him are challenging the title. We are abundantly satisfied that J. H. Johnston never had any beneficial interest, in and to the land in controversy, and that plaintiff, if she be his widow, is not entitled to any interest therein.

III. This finding is sufficient to dispose of the case, and we need not consider the other propositions involved. It may not be out of place to say, however, that we think the Nebraska court had jurisdiction to decree the divorce which was granted J. H. Johnston, and that this decree is valid and binding and estops plaintiff from claiming anything as his widow. This finding is also aided by the subsequent conduct of both J. H. Johnston and plaintiff herein. Johnston was twice married after obtaining the Nebraska divorce. This plaintiff knew, for

he brought both his second and third wife into the community where plaintiff resided, and introduced each as his wife.   Plaintiff did nothing with reference to the land or with reference to her former husband's conduct with these women.

On the entire record we are satisfied that the decree of the trial court is correct, and it is therefore *affirmed*.